No. 03-604

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 338

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

DUANE ALAN OTTO,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and for the County of Fergus, Cause No. DC 2003-08
The Honorable Randal I. Spaudling, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

           Torger S. Oaas, Attorney at Law, Lewistown, Montana

        For Respondent:

           Honorable Mike McGrath, Montana Attorney General, C. Mark Fowler,
Assistant Attorney General, Helena, Montana; Thomas P. Meissner, Fergus
County Attorney, Lewistown, Montana

Submitted on Briefs:  July 14, 2004

Decided:  November 30, 2004

Filed:

                               Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Duane Alan Otto pled guilty to a first offense violation of § 61-8-401, MCA, driving under the influence of alcohol ("DUI").  The plea was made pursuant to § 46-12-204(3), MCA, allowing Otto to appeal the District Court's denial of both his Motion to Dismiss and his Motion to Suppress.  We affirm.

## ISSUES

¶2    1. Did the District Court err when it denied Otto's pre-trial Motion to Dismiss on the grounds that the arresting officer did not have particularized suspicion to execute a traffic stop?

¶3    2. Did the District Court err when it denied Otto's pre-trial motion to suppress his breathalyzer results when the machine failed to print the results?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4    On the evening of May 30, 2002, Officer Kelly Mantooth was patrolling westbound on U.S. 87 east of Lewistown.  He noticed a vehicle in front of him--later determined to be Otto's--make a "drastic swerve" to the right and then to the left and straighten out.  Mantooth testified that he thought the vehicle might have swerved to avoid a deer or something in the road, so he slowed down to investigate the area.  He saw nothing, so he turned on his patrol car's video camera and accelerated to get closer to the vehicle.

¶5    Mantooth observed that the vehicle was a white pick-up truck and that it was now closely following a camper trailer.  Mantooth did not observe any other questionable driving maneuvers, so he turned off his video camera.  Shortly thereafter, the camper turned into a

2

gas station, and the pick-up again swerved to the right and then left, crossing about a quarter of its width into the center turn lane. The pick-up then returned to the driving lane. Mantooth described the swerving as "drastic." He turned his patrol car video camera back on and activated his emergency lights to stop the pick-up. In response, the pick-up turned into a parking lot, one rear wheel hitting the curb as it did so.

¶6 Mantooth approached the pick-up and asked Otto if he had been drinking. Otto explained that he had been talking on a cellular telephone. Mantooth testified that Otto had red, watery eyes and that he was slurring his words. He also noticed the smell of alcohol on Otto's person. Mantooth asked Otto to bring his driver's license, registration and proof of insurance to Mantooth's patrol vehicle. Otto had some difficulty completing this request. He initially retrieved an expired insurance card and registration papers for a different vehicle. He returned to his vehicle for the correct paperwork and dropped his papers while getting out of the pick-up. Mantooth performed a Horizontal Gaze Nystagmus ("HGN") test on Otto. He then advised Otto that he was under arrest for driving under the influence of alcohol and transported him to the police department for further processing. Otto was also cited with violating § 61-8-302, MCA, for "careless driving, by crossing centerline and following too close[ly]," according to the citation.

¶7 Otto performed field sobriety tests at the police station and agreed to submit to a breathalyzer test. Mantooth testified that the LED readout on the testing instrument reflected a blood alcohol concentration of .159, but the printer attached to the testing instrument failed to print the result on the printout card. Officer Tom Moring, who is a certified operator of

3

the testing instrument, also observed the .159 reading, and testified that, other than the failure to print the result, the instrument appeared to be functioning properly. Officer Moring printed a blank test card and transcribed the instrument readings onto it.

¶8 Otto filed a motion to dismiss on the grounds that Mantooth lacked particularized suspicion to stop his vehicle. He also filed a motion to suppress evidence of the breathalyzer result on the grounds that it did not meet the definition of "test" as found in ARM 23.4.201(31). Both motions were denied. On July 21, 2003, Otto pled guilty and reserved the right to appeal the denials of his motions. He further requested and was granted suspension of the prosecution on the charge of Careless Driving, pursuant to § 61-8-302, MCA, pending the outcome of this appeal.

## STANDARD OF REVIEW

¶9 We review a district court's denial of a motion to dismiss *de novo* to determine whether the decision was correct. *State v. Loney*, 2004 MT 204, ¶ 6, 322 Mont. 305, ¶ 6, 95 P.3d 691, ¶ 6 (citation omitted). We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law is correct. *State v. Marks*, 2002 MT 255, ¶ 10, 312 Mont. 169, ¶ 10, 59 P.3d 369, ¶ 10 (citations omitted).

4

## DISCUSSION

## ISSUE ONE

¶10    Did the District Court err when it denied Otto's pre-trial Motion to Dismiss on the grounds that the arresting officer did not have particularized suspicion to execute a traffic stop?

¶11    Otto argues that he did not violate any traffic laws nor engage in erratic driving in any manner that would have created the particularized suspicion requisite for Officer Mantooth to have executed a traffic stop. He claims that by focusing on the word "drastic," as the officer described Otto's swerving, the District Court found that there was sufficient objective data for Officer Mantooth to stop Otto's vehicle in contravention of significant evidence to the contrary. Otto points out that Mantooth admitted that on the first observed swerve, he did not see Otto cross either the fogline or the centerline of the highway, and that the maneuver was consistent with avoiding a deer or other obstacle in the road. Otto further claims that the second swerve which Mantooth observed likewise did not cause Otto to cross the fogline. He admits that he did go partway into the center turn lane and then return to his lane of travel, but maintains that to do so was not a violation of any traffic laws. Otto also claims that the District Court misunderstood the design of the roadway where the swerve occurred. He states that there is not a "centerline," but rather a center turn lane which divides the eastbound and westbound lanes of travel as U.S. Highway 87 passes through this part of Lewistown. Otto claims that crossing into the center turn lane is not equivalent to

crossing the centerline and that the District Court thus twice incorrectly described his vehicle as having crossed the centerline.

¶12    The State responds that Officer Mantooth's observations allowed him to form a particularized suspicion which justified the investigative stop of Otto's vehicle. The State disagrees with Otto's assertion that he committed no traffic offense when he crossed into the center turn lane and then returned to his lane of travel. The State claims that Otto violated § 61-8-321(1), MCA, which provides that vehicles must be driven on the right side of the roadway, except for certain situations--none of which applied in this particular instance. The State points to three occurrences--Otto's initial swerve, his following the camper trailer too closely, and his second swerve--which led to Mantooth's particularized suspicion.

¶13    Otto replies that Mantooth's first observance of allegedly bad driving is irrelevant to the particularized suspicion issue because Mantooth admits the swerve occurred entirely within Otto's lane of travel, and this Court has held that weaving within one's own lane of travel is insufficient to establish probable cause. *Morris v. State*, 2001 MT 13, ¶ 10, 304 Mont. 114, ¶ 10, 18 P.3d 1003, ¶ 10. Otto further argues that his swerve partway into the center lane is not a violation under § 61-8-321, MCA, because moving into a center turn lane is an exception to the rule that vehicles must always drive on the right.

¶14    Otto points to several Opinions in which we have held that questionable driving behaviors observed by police officers were insufficient to allow for particularized suspicion to execute a traffic stop. See *State v. Reynolds* (1995), 272 Mont. 46, 899 P.2d 540 (driving which was "bordering on traveling too fast" and waiting too long at a four-way stop sign with

6

no traffic laws broken insufficient for particularized suspicion); *State v. Lafferty*, 1998 MT 247, 291 Mont. 157, 967 P.2d 363 (crossing the fogline twice and driving on it once without any traffic citations issued as a result of the maneuvers insufficient for particularized suspicion); *Morris*, ¶ 10 ("drifting" over the fogline without being cited for any driving offenses other than the DUI insufficient for particularized suspicion). But see *State v. Loiselle*, 2001 MT 174, 306 Mont. 166, 30 P.3d 1097 (drifting across the fogline, turning into parking lot of a closed business without signaling and then pulling back out into traffic after "losing" patrol car, changing lanes without signaling, driving on the fogline, and weaving slightly back and forth sufficient for particularized suspicion although no other traffic citations issued).

¶15    Pursuant to § 46-5-401, MCA, a peace officer may stop any vehicle that is observed in circumstances that create a particularized suspicion that the occupant has committed, is committing, or is about to commit an offense. In order to prove the existence of a particularized suspicion sufficient to stop a vehicle, the prosecution must show objective data from which an experienced peace officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is engaged in wrongdoing. *Lafferty*, ¶ 9 (citation omitted). Whether a particularized suspicion exists to justify an investigative stop is a question of fact which depends on the totality of the circumstances. *Lafferty*, ¶ 10 (citation omitted).

¶16    In *Loney*, we reversed a district court's dismissal of charges against the defendant, on the grounds that the officer who stopped her vehicle had the requisite particularized

7

suspicion to do so. *Loney*, ¶ 16. Loney was observed crossing the centerline of a two-lane highway in a no-passing zone three times at speeds of 65 to 70 miles per hour, and twice crossing the fogline at the edge of the highway. *Loney*, ¶ 2. Loney was stopped by a police officer and subsequently cited for DUI and failing to drive on the right side of the roadway in violation of § 61-8-321, MCA. While the district court relied on *Morris* when it dismissed the charges against Loney, we distinguished *Morris*, noting that, unlike Loney, Morris was not cited for any driving offenses other than DUI. *Loney*, ¶ 9, citing *Morris*, ¶ 10.

¶17    In *Loney*, we relied upon *Widdicombe v. State ex rel. Lafond*, 2004 MT 49, 320 Mont. 133, 85 P.3d 1271, in which highway patrol officers stopped a vehicle which crossed the centerline of a two-lane highway by a tire's width at least three times. *Widdicombe*, ¶ 5. The district court refused to reinstate Widdicombe's suspended driver's license and we affirmed, explaining that driving a vehicle across the yellow centerline, absent one of the statutory exceptions, constitutes a traffic violation under § 61-8-321, MCA. *Widdicombe*, ¶ 13.

¶18    Otto would have us distinguish crossing the centerline of a highway from crossing the line which separates the driving lane from a center turn lane. He further maintains that his crossing partway into the center turn lane meets one of the exceptions of § 61-8-321(1), MCA. He does not, however, tell us which one. In *Widdicombe*, we explained that § 61-8-321, MCA, prohibits drivers from "carelessly crossing the yellow center line and subjecting themselves and other drivers on the road to the possibility of a head-on collision." *Widdicombe*, ¶ 12. In Otto's case, crossing carelessly into a center turn lane where there is

the possibility of meeting on-coming traffic likewise places drivers in the position of potentially facing a head-on collision. Furthermore, the language of § 61-8-321, MCA, enunciates the specific exceptions to the right-side rule. None of them apply to Otto's situation.

¶19 Observation of a traffic offense is sufficient to establish particularized suspicion. *Loney*, ¶ 16. Otto's protestations to the contrary, he *was* cited for another traffic offense. Officer Mantooth observed Otto drive somewhere other than the right side of the roadway, a possible violation of § 61-8-321, MCA. While Otto's driving errors may not have been as egregious as those in *Loney* or *Widdicombe*, unlike the defendant in *Morris*, he was cited for a violation other than DUI.

¶20 Thus, we conclude the District Court correctly held that Officer Mantooth had the requisite particularized suspicion to execute a traffic stop of Otto's pick-up, pursuant to § 46-5-401, MCA. We affirm its denial of Otto's Motion to Dismiss.

## ISSUE TWO

¶21 Did the District Court err when it denied Otto's pre-trial motion to suppress his breathalyzer results when the machine failed to print the results?

¶22 Otto argues that the District Court erroneously denied his motion to suppress the results of his breathalyzer test because no printed record of his breath test was obtained after he blew into the breathalyzer machine. He claims that his breathalyzer sample did not meet the definition of "test" as found in ARM 23.4.201(31), and thus the result should not have been allowed as evidence of guilt.

9

¶23 ARM 23.4.201(31), states in pertinent part:

"Test", in reference to a breath analysis, means a full and complete analysis of properly delivered breath sample(s). Such analysis is to be considered complete when the breath analysis instrument has executed its prescribed program, a final result is obtained and a printed record is produced by the breath test instrument.

¶24 The State points out Otto has not argued that the admission of his breathalyzer results was prejudicial. This Court will not reverse a district court unless the record shows that the error was prejudicial. Section 46-20-701(1), MCA. Furthermore, the State maintains, while a defendant charged with DUI is entitled to the procedural safeguards contained within the administrative rules, in the case at hand, Otto has misconstrued a definition as a substantive directive.

¶25 The District Court found that, at the time the breathalyzer test was administered, the printer malfunctioned through no apparent fault of Officers Mantooth and Moring. The District Court further found that the breathalyzer did execute its prescribed program and did show a final result--.159, as witnessed and manually written down by the officers. The District Court further concluded that, while ARM 23.4.201(31) defines a "test," there is no other administrative rule which lists or states the consequences of a failure of the instrument to actually print its result. The District Court acknowledged that "such a definition serves no purpose, if there is no rule which specifies a consequence."

¶26 Otto relies on our holdings in *State v. Woods* (1997), 285 Mont. 124, 947 P.2d 62, and *State v. McDonald* (1985), 215 Mont. 340, 697 P.2d 1328. In *McDonald*, the results of a blood test were found to be inadmissible by this Court because the person who drew the

10

defendant's blood at the hospital was not properly identified on the hospital record as required by ARM 23.3.931. *McDonald*, 215 Mont. at 345-46, 697 P.2d at 1331. In *Woods*, we reiterated that a defendant charged with a DUI is entitled to the procedural safeguards contained within the administrative rules. *Woods*, 285 Mont. at 127, 947 P.2d at 63. (In a special concurrence in *Woods*, it was explained that while the *McDonald* rule may be correct, the *McDonald* decision itself is of questionable authority due to a change in the applicable statutes which occurred during the course of that proceeding. *Woods*, 285 Mont. at 130, 947 P.2d at 65-66 (Nelson, J., specially concurring.).)

¶27    Regardless, we need not reach *McDonald* or *Woods* to render our decision here. Significantly, and as the State notes, Otto has not argued that he was prejudiced by the admission of the breathalyzer results. Moreover, the court had ample other evidence before it, including the HGN results, the results from the field sobriety test performed at the police station, Otto's difficulty in retrieving and presenting the relevant paperwork, and the smell of alcohol on his person, much of which was preserved on the patrol car videotape and all of which was the subject of testimony by Officer Mantooth.

¶28    On the record before us, the prejudicial effect of the breathalyzer results has not been either argued or established. Thus, we conclude the District Court's denial of Otto's Motion to Suppress the breathalyzer results is not cause for reversal.

### CONCLUSION

¶29    For the foregoing reasons, we affirm the District Court.

11

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART